NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 5, 2006
Decided January 26, 2007

**Before**

Hon. JOEL M. FLAUM, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 06-1640

| | |
|---|---|
| ADIL DZELILI,<br>                 *Petitioner,* | Petition for Review of an Order of<br>the Board of Immigration Appeals |
|      *v.* | No. A79-414-796 |
| ALBERTO R. GONZALES,<br>                 *Respondent.* | |

**O R D E R**

Adil Dzelili, an Albanian Muslim, is a 26-year-old native and citizen of Macedonia who fraudulently attempted to enter the United States in July 2001 using false documents. After being placed in removal proceedings, Dzelili conceded removability and filed an application for asylum and withholding of removal, alleging that he feared being persecuted because of his political opinion and status as an ethnic Albanian if he was removed. An immigration judge (IJ), concluding that Dzelili failed to demonstrate past persecution or a well-founded fear of future persecution, denied Dzelili's asylum application and ordered him returned to Macedonia. Dzelili was also determined to be ineligible for withholding of removal,

which requires a higher standard of eligibility.  See INS v. Cardoza-Fonseca, 480
U.S. 421, 448–49 (1987).  Upon appeal, the Board of Immigration Appeals (BIA)
issued an order (from which Dzelili now petitions for our review) affirming the IJ's
decision without opinion in accordance with 8 C.F.R. § 1003.1(e)(4).[1]

In his asylum application and evidentiary hearing, Dzelili alleged the
following facts (the IJ held that his testimony was credible).  He was born and
raised in the small village of Leshnica, Macedonia, a community primarily
populated by ethnic Albanians.  Beginning in 2000, ethnic tensions in Macedonia
boiled over, and a war broke out between the Macedonian government and ethnic
Albanian rebels led by the National Liberation Army (known locally as the UCK).
Dzelili has never belonged to any political party, but despite his preference to
remain neutral in the budding conflict, he was pressured by his cousin, a UCK
leader in the village, who sought to recruit him to the UCK cause.  Dzelili refused
and was ostracized by his cousin and community; he was also labeled a traitor.  On
one occasion, members of the UCK came to his house looking for him, but they left
after his father told them he was not at home.

At the same time, Dzelili received several letters ordering him to report for
service in the Macedonian military, which would have required him to fight against
the UCK.  Although military service is mandatory in Macedonia, he ignored these
orders, tearing them up upon receipt.  Not reporting prompted military authorities
to come looking for him, but because his mail was routed to a central post office
they never discovered his precise address and could not locate him.

In an effort to flee these competing pressures Dzelili left town and moved to
the city of Tetovo, where he faced new problems.  Shortly after his arrival he was
stopped by police on the street and asked by a Macedonian officer for his
identification.  Presumably realizing that Dzelili was an ethnic Albanian, the officer
warned him to leave town.  A few days later, while on his way to visit his doctor,
Dzelili approached a police checkpoint, where he was recognized by the same officer
who warned him to leave.  That officer proceeded to beat him with rubber sticks
until he passed out.  When he regained consciousness alone near the checkpoint, he

---

[1] At oral argument, Dzelili's counsel withdrew an additional argument presented in his
brief that the IJ erred by failing to inform him that he had the right to withdraw his application
for admission to the United States.  That tactic would have allowed Dzelili to choose his own
destination and avoid being subject to the 10-year bar against reentering the United States
imposed by an order of removal.  See 8 U.S.C. § 1182(a)(9)(A)(ii).

was able to get himself to a doctor, where he received treatment for 2 or 3 days before being released. A few weeks later he left for the United States.

After considering Dzelili's testimony at his hearing, the IJ ruled that he had shown neither past persecution nor a well-founded fear of future persecution. In her decision she explained that neither compulsory military service nor recruitment by rebel guerillas constituted persecution on the basis of political opinion and concluded that there was not enough evidence to establish that Dzelili's police beating was the result of institutionalized, government-sanctioned ethnic group persecution as opposed to "mere discrimination" on the part of an officer abusing his authority. She also held that Dzelili's fear of future persecution was not objectively reasonable because conditions in Macedonia had improved, such that the war between ethnic Albanians and the Macedonian government had ceased and multi-ethnic party representation in the government had become the norm.

Because the BIA summarily affirmed, the IJ's decision is the basis of our review. Niam v. Ashcroft, 354 F.3d 652, 655–56 (7th Cir. 2004). The IJ's factual determinations are reviewed under the highly deferential substantial-evidence standard, Zhu v. Gonzales, 465 F.3d 316, 318 (7th Cir. 2006); for Dzelili to prevail he must show not only that the record evidence supports reversing the IJ's decision, but that the reversal is compelled. Liu v. Ashcroft, 380 F.3d 307, 312 (7th Cir. 2004) (citing INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1 (1992)).

To demonstrate eligibility for asylum, Dzelili must establish that he suffers from a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). That fear may be demonstrated using either a prospective or retrospective approach. See 8 C.F.R. § 208.13(b). Prospectively, an applicant may establish a well-founded fear of persecution in the future by offering evidence that supports the conclusion that the applicant's fear is both subjectively genuine and objectively reasonable. Chakir v. Gonzales, 466 F.3d 563, 569 (7th Cir. 2006). Retrospectively, an applicant may establish a rebuttable presumption that he has a well-founded fear of persecution by providing evidence of persecution that he has suffered in the past. Tesfu v. Ashcroft, 322 F.3d 477, 481 (7th Cir. 2003). Under this second approach, the government may then rebut the persecution presumption by demonstrating that conditions have changed in the country in question such that there is no longer any reasonably objective basis for the applicant to fear persecution upon return. Dzelili makes his case for persecution using both approaches.

Regardless of the approach, establishing persecution does not require a showing that an applicant's life or freedom were or will be threatened, but the harm described by persecution evidence must result from more than just unpleasant or dangerous conditions, such that "mere harassment" is not persecution. Nakibuka v. Gonzales, 421 F.3d 473, 476 (7th Cir. 2005) (citation omitted). In other words, "persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." Firmansjah v. Gonzales, 424 F.3d 598, 605 (7th Cir. 2005).

In this appeal, Dzelili first challenges the IJ's conclusions that the UCK and Macedonian armed forces were each incapable of inflicting the kind of past persecution that the asylum statutes are designed to protect against. While the IJ's resolution of these issues may have been cursory, we find no reason to conclude that this aspect of her decision was in error.

With respect to Dzelili's recruitment by the UCK, the IJ cited INS v. Elias-Zacarias, 502 U.S. 478 (1992), and held that recruitment by a rebel organization does not constitute political opinion persecution. In Elias-Zacarias, the Supreme Court held that the efforts of a Guatemalan guerrilla organization to conscript the petitioner into serving in its ranks did not constitute persecution on the basis of political opinion. Id. at 482–83. The Court explained that the petitioner was required to demonstrate both that his refusal to join was based on a political opinion rather than mere "indifference, indecisiveness, and risk averseness," and that the harm he feared from the guerrillas would be inflicted upon him because of that opinion and not for some other reason, such as a desire to increase the group's forces. Id.

We have since explained that to overturn an IJ in these situations--that is, for us to conclude that the record compels a finding of political opinion persecution-- the petitioner must offer evidence of his own political activity in opposition to the rebel forces. Tapiero de Orejuela v. Gonzales, 423 F.3d 666, 674 (7th Cir. 2005). We have also held that a rebel threat does not constitute persecution unless the available government protection is so ineffectual as to warrant the conclusion that the government effectively sponsors the rebels' persecutory conduct. Hor v. Gonzales, 400 F.3d 482, 485–86 (7th Cir. 2005); see also Balogun v. Ashcroft, 374 F.3d 492, 499 n.8 (7th Cir. 2004).

Dzelili offers no evidence to establish any of these elements, much less to compel our conclusion that the IJ got it wrong. Rather than offer evidence of his political activity, he emphasizes that he has never belonged to any political party, a tack that suggests the kind of "indifference, indecisiveness, and risk averseness"

referred to in Elias-Zacarias.[2]  Nor does he present evidence that the Macedonian government would have countenanced violence taken against him by the UCK. Discrimination inflicted by discrete groups with a uniform ideology cannot be "persecution" where the relevant government authorities prohibit and make efforts to punish such conduct.  But see Tapiero de Orejuela, 423 F.3d at 674 (suggesting that the powerful FARC rebels in Columbia are capable of political opinion persecution).

Regarding his refusal to serve in the Macedonian armed forces, Dzelili argues that he was per se subject to persecution on the basis of his ethnicity because military service would require him, as an ethnic Albanian, to fight against his fellow ethnic Albanians.  Although required military service would not typically be considered a form of ethnic group persecution, we have held that it can be when draft notices are just tools intended to place a singled-out ethnic group in harm's way.  Miljkovic v. Ashcroft, 376 F.3d 754, 756 (7th Cir. 2004).  But again, Dzelili failed to offer any evidence that places his recruitment in this category.  There is nothing to suggest either that he was sought for military service because of his ethnicity or that the punishment he feared for ignoring the draft notices would be inflicted for his ethnicity, rather than for his failure to comply with the law mandating military service.  His inability to establish either of these improper motives strongly suggests that the IJ's conclusion should not be disturbed.

Dzelili next challenges the IJ's finding that the beating he suffered at the hands of the Macedonian police officer did not rise to the level of persecution on the basis of ethnicity.  He argues that the IJ should have concluded that the beating alone was severe enough to constitute persecution and that, even if it was not, it establishes ethnic persecution when viewed in conjunction with the government's efforts to conscript him into military service.  We have already concluded that Dzelili's draft orders did not constitute ethnic group persecution; the fact that a different government official later subjected Dzelili to physical violence in a different city does not cure the evidentiary deficiencies that led to our conclusion on that issue.  We therefore need only address the question of severity.

As recently explained in Zhu v. Gonzales, 465 F.3d 316, 320 (7th Cir. 2006), we have typically reversed an IJ's finding of no past persecution based on the

---

[2]  In fact, even if the decision not to choose sides in a conflict were considered a political opinion, as the Elias-Zacarias dissent contended, see 502 U.S. at 486–87 (Stevens, J., dissenting), Dzelili had the burden to provide evidence compelling the IJ to find that his choice of neutrality was a political one, something he has similarly failed to do.

severity of the harm in cases involving asylum applicants who have been the victim of more than just "a singular event" of beating. See, e.g., Prela v. Ashcroft, 394 F.3d 515, 517–18 (7th Cir. 2005) (upholding BIA's finding of no past persecution where applicant's hands had been injured during 24 hours of detention in which he was harassed, interrogated, and threatened with death); Liu v. Ashcroft, 380 F.3d 307, 313 (7th Cir. 2004) (same, where applicant had been subject to hair-pulling during 2-day detention). In Zhu, we concluded that, although Zhu's single beating caused him serious injury and seemed to weigh in favor of a finding of past persecution, the fact that "his ordeal on the whole is less serious in that he was never detained and never endured additional humiliating or harmful official action" did not provide enough to overcome the deference we accord to the BIA in such matters. 465 F.3d at 320.

Dzelili's beating, although serious, is the kind of singular event described in Zhu. Although he had a previous run-in with the police prior to his beating, each incident involved the same officer, and he was never detained for any period of time. His ordeal was limited to one occasion from which he was able to escort himself to a doctor and after which he faced no further difficulties despite remaining in the area for several weeks. We do not intend to trivialize the harm Dzelili suffered. Our analysis is merely a reflection of the deferential nature of our review of the IJ's decision, and we cannot say that the evidence, as presented, compels overturning her judgment in this case.

This leaves only Dzelili's claim that he fears future persecution upon return to Macedonia. As the IJ properly noted, conditions in Macedonia for ethnic Albanians have changed since Dzelili fled the country in 2001. The civil war Dzelili describes between the UCK and the Macedonian government began and ended in a matter of months after NATO helped to broker the Ohrid Agreement, signed by both sides on August 13. In addition to ending the fighting, the agreement enabled Albanian to be named as a second official language in the country and provided other institutionalized protections for minority ethnic groups. Since then, ethnic Albanian participation in the government has been increased, and some semblance of peace has been restored. Vesna Peric Zimonjic, Macedonians Shun Attempt to Block Albanian Autonomy, Independent (UK), Nov. 8, 2004, at 22. This stability was a major reason Macedonia is now under consideration as a candidate for eventual membership in the European Union. See Dan Bilefsky, Romania and Bulgaria Join EU: "An Enormous Chance For New Generations", Int'l Herald Trib., Jan. 2, 2007, at 1.

Of course, this is not to suggest that all political and ethnic tensions in the country have subsided, only that Dzelili cannot rely on conditions as they existed

when he left the country in 2001 to demonstrate an objectively reasonable fear of persecution if he returns there in 2007.  He must instead provide further evidence establishing the objective threat, and he has failed to do so.  Instead, he simply challenges the IJ's reliance on the State Department's report about conditions in Macedonia and argues that she failed to give weight to certain troubling incidents of violence mentioned in the report that have occurred since 2001.  Dzelili is correct that we have previously expressed concern about the over-reliance upon State Department reports in evaluating country conditions, see, e.g., Galina v. INS, 213 F.3d 955, 957 (7th Cir. 2000), but, as the news reports we have cited make clear, we see no reason to doubt the State Department's report about improvements in ethnic relations in the country in this case.  As for the examples of violence cited in that report that Dzelili believes the IJ improperly ignored, "generalized conditions of strife do not support a claim for asylum because they do not show that [a petitioner] himself will be singled out for persecution on account of one of the enumerated grounds."  Bradvica v. INS, 128 F.3d 1009, 1013 (7th Cir. 1997).

For these reasons, Dzelili's petition for review is DENIED.